UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

RICKY BELL, N20653,
    Plaintiff,

v.                                                                  07-cv-1288

SETH OSAFO, et al.,
    Defendants.

Memorandum Opinion and Order

Before the court are the defendants, Dr. Seth Osafo's summary judgment motion [73] and the plaintiff's response [76].

Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added).  Personal knowledge may include inferences and opinions drawn from those facts.  *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).  "But the inferences and opinions must be grounded in observation or other first-hand personal experience.  They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.  It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment.  Keri v. Barod of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997)).

## Background

Plaintiff applied for a job in the bakery at the Illinois River Correctional Center.  Plaintiff was told by Illinois Department of Correction (hereinafter IDOC) officials that he was not qualified to handle food  and therefore could not work in the bakery.  Plaintiff then concluded that he was suffering from some unknown illness which has been diagnosed by Dr. Osafo.  Defendant, Dr. Osafo states that Plaintiff has absolutely no evidence of this illness and no evidence that Dr. Osafo has diagnosed or is withholding a diagnosis from him.  Defendant further states that it is undisputed that the entire time the Plaintiff was under the care of Dr. Osafo that he was food handler approved.   Further, Defendant states that Plaintiff is not suffering from any illness of which he is not already aware.  Further, Defendant states that it appears that IDOC officials made a mistake in telling the Plaintiff that he was not food handler qualified.   Further, Defendant states that Plaintiff has no evidence that Dr. Osafo discriminated against him.  Defendant asserts that Plaintiff admits that Dr. Osafo did not play any role in determining which inmates worked in the baker other than determining their qualification as a food handler.   Defendant maintains that summary judgment is proper in this case.

## Undisputed Material Facts[1]

1. At all relevant times Plaintiff was incarcerated at the Illinois River Correctional Center.
2. Plaintiff has no evidence that he had a communicable disease while he was incarcerated at the Illinois River Correctional Center[2]. (Exhibit 1, p. 28.)
3. No doctor has ever diagnosed the Plaintiff with a communicable since his transfer from the Illinois River Correctional Center. (Exhibit 1, p. 30-32.)

---

[1]In his response,  Plaintiff attempts to dispute many of the material facts, but he has no evidence other than a self serving affidavit. Further, most of his statements are merely argumentative, but no corroborating documents.  It is put up or shut up time.  Further, Plaintiff attached no medical records to support his allegations that he had symptoms of a mystery illness..

[2]Plaintiff's attempt to dispute this fails.  In support, he points to his self-serving affidavit, Exhibit A attached to his memorandum of law.

4. Plaintiff alleges Dr. Osafo has diagnosed and is monitoring an unknown disease because he provided thorough physical examinations to the Plaintiff. (Exhibit 1, p27.)
5. Plaintiff has no evidence to suggest that Dr. Osafo was hiding an illness from him[3]. (Exhibit 1, p 29.)
6. According to the medical records, the Plaintiff was transferred to the Illinois River Correctional Center on January 22, 2004. (Exhibits 2 and 3.)
7. According to the medical records, on January 22, 2004, the Plaintiff underwent an orientation interview with a Registered Nurse. (Exhibits 2, 4 and 5.)
8. Included in the orientation interview was a food handler interview. The medical records indicate the Plaintiff participated in the food handler interview. (Exhibits 2 and 5.)
9. On January 22, 2004, it is noted in the Plaintiff's medical records that he was food handler approved. (Exhibits 2 and 6.)
10. On February 1, 2004, Plaintiff was seen by a Licensed Practical Nurse in regards to issues of properly taking his hypertension medicine. (Exhibits 2 and 6.)
11. The next time Plaintiff was seen in the Health Care Unit was February 19, 2004. Plaintiff was seen in the Health Care Unit by Seth Osafo, M.D. during the hypertension clinic. During the visit, Dr. Osafo reviewed Plaintiff's medications, cardiac needs, and noted that the Plaintiff has no subjective complaints. He also performed a neurological, cardiovascular, and respiratory exam. All exams were within normal limits. Dr. Osafo educated the patient on risk reduction for his hypertension, diet, medication compliance, exercise, and smoking. Finally, he ordered the Plaintiff follow-up on March 30, 2004. (Exhibits 2, 7 and 8.)
12. At no time during this visit did Dr. Osafo diagnose the Plaintiff with any sort of communicable disease that would prevent him from being food handler approved. (Exhibit 2.)
13. On March 17, 2004, there is a Registered Nurse note that Plaintiff had a blood draw done for his lab work in preparation for his follow-up in the hypertension clinic. (Exhibits 2 and 9.)
14. Plaintiff was next seen on March 24, 2004 in the Health Care Unit during regarding scheduled hypertension clinic visits. According to the record, Plaintiff was seen by Dr. Dexter Hazlewood. Plaintiff's medications and lab results were reviewed. According to this record, the Plaintiff was not diagnosed with any communicable disease. Nor was Plaintiff found to be ineligible to be a food handler. (Exhibits 2, 10 and 11.)
15. On April 20, 2004, the Plaintiff again underwent a lab draw in order to monitor his hypertension. (Exhibits 2 and 12.)
16. On April 24, 2004, the Plaintiff was seen in the MD Sick Call by Dr. Dexter Hazlewood. Dr. Hazlewood's note from that date states as follows:
    > Subjective: Here for follow-up of labs status post initiation of statin therapy. Patient offers no complaints at this time.

---

[3] Plaintiff's attempt to dispute this fails. He points to his self-serving affidavit, Exhibit A attached to his memorandum of law. Further he cites Plaintiff's Exhibit B and C. His exhibits are not identified, except A. However, not one of Plaintiff's exhibit supports his attempt to dispute this fact.

       Objective: Vital signs as above. Head, ears, nose and throat
       negative. Abdomen positive bowel sounds, negative tenderness.
       Assessment: Good results: LDL now 59. No increase in LPTs.
       Plan: Continue current care. Follow-up hypertension clinic.
       (Exhibits 2 and 12.)

17. On this date, it appears the Plaintiff was seen by Dr. Dexter Hazlewood in follow-up for having started a statin therapy program. Dr. Hazlewood reviewed Plaintiff's lab results and ordered the Plaintiff continue his current care and to follow-up in the hypertension clinic. (Exhibit 2.)
18. On July 15, 2004, Plaintiff again underwent a lab draw in preparation for his regularly-scheduled hypertension clinic visit. The blood draw was performed to monitor the Plaintiff's cholesterol. (Exhibits 2 and 13.)
19. On July 22, 2004, Plaintiff was against seen by Dr. Dexter Hazlewood on his regularly-scheduled hypertension clinic. The Plaintiff's medications were reviewed, and he underwent a physical examination performed by Dr. Hazlewood. As a result of this visit, Dr. Hazlewood renewed Plaintiff's prescription medications. (Exhibits 2, 14 and 15.)
20. On October 7, 2004, Plaintiff underwent a routine EKG in order to monitor his hypertension. (Exhibits 2 and 16.)
21. On October 10, 2004, Plaintiff again underwent a blood draw in preparation for his next regularly-scheduled visit in the hypertension clinic. (Exhibits 2 and 16.)
22. On October 13, 2004, Plaintiff received his annual TB screen. It is noted on this test that the Plaintiff is food handler approved. (Exhibits 2 and 17.)
23. On November 11, 2004, Plaintiff again underwent a blood draw to monitor his lipids. (Exhibits 2 and 18.)
24. On November 16, 2004, Plaintiff was seen by Dr. Dexter Hazlewood on the regularly-scheduled visit in the hypertension clinic. During this visit, Plaintiff's medication were reviewed. As a result of this visit, Plaintiff's medications were renewed and he was ordered to follow-up on March 15, 2005. (Exhibits 2, 19 and 20.)
25. On March 1, 2005, Plaintiff again underwent a blood draw in preparation for his upcoming visit in the hypertension clinic. (Exhibits 2 and 21.)
26. On March 15, 2005, Plaintiff again was seen by Dr. Dexter Hazlewood during a regularly-scheduled hypertension clinic visit. Plaintiff's medications were reviewed. As a result of this visit, Plaintiff's medications were renewed and he was ordered to follow-up on July 19, 2005. (Exhibits 2, 22 and 23.)
27. On July 5, 2005, Plaintiff again underwent a lab draw in preparation for his upcoming visit in the hypertension clinic. As with all previous lab draws, the blood was sent to Quest Labs, Inc. in order to undergo the required testing. (Exhibits 2 and 24.)
28. On July 19, 2005, Plaintiff was again seen by Dr. Dexter Hazlewood during a regularly-scheduled hypertension clinic visit. Again, Plaintiff's medications were reviewed and renewed and he was ordered to follow-up again on November 17, 2005. (Exhibits 2, 25 and 26.)
29. On September 22, 2005, there is a medical record note indicating that the Plaintiff was seen in the Health Care Unit per his request. Plaintiff was requesting information about DNA testing. Plaintiff was informed that the Health Care Unit does not handle DNA

30. testing and he was instructed to contact the Bureau of Investigations about his request. (Exhibits 2 and 27.)
31. On October 1, 2005, Plaintiff underwent a routine EKG as part of his care for his hypertension. (Exhibits 2 and 27.)
32. On November 10, 2005, Plaintiff again underwent a lab draw in preparation for his regularly-scheduled chronic care hypertension clinic visit. This lab draw was sent to LabCorp for the required testing. (Exhibits 2 and 27.)
33. On November 27, 2005, Plaintiff was seen by Dr. Dexter Hazlewood with complaints of chest pains. Plaintiff was given his blood pressure medication and stated that he was no longer experiencing chest pains. (Exhibits 2, 28 and 29.)
34. On November 28, 2005, Plaintiff was seen by Dr. Dexter Hazlewood for his regularly-scheduled hypertension clinic visit. Plaintiff's medications were reviewed and renewed, and he was ordered to follow-up again on March 28, 2006. (Exhibits 2, 30 and 31.)
35. On March 14, 2006, Plaintiff underwent a blood draw in preparation for his regularly-scheduled hypertension clinic visit. (Exhibits 2 and 32.)
36. On March 29, 2006, Dr. Osafo saw the Plaintiff for his regularly-scheduled hypertension clinic visit. On this date, he reviewed Plaintiff's medications and blood lab work. As a result of this meeting, Dr. Osafo continued Plaintiff's medications and ordered him to follow-up again in the hypertension clinic on July 17, 2006.  On this date, Dr. Osafo did not diagnose the Plaintiff with any communicable diseases nor did he find the Plaintiff to be unqualified as a food handler. (Exhibits 2, 33 and 34.)
37. On July 5, 2006, Plaintiff underwent a blood draw in preparation for his regularly-scheduled hypertension clinic visit. (Exhibits 2 and 35.)
38. On July 17, 2006, Plaintiff was seen by Dr. Osafo in the hypertension clinic. Dr. Osafo reviewed and renewed the Plaintiff's prescription medications.  He also ordered the Plaintiff to again follow-up with him in the hypertension clinic on November 20, 2006. At no time during this visit did Dr. Osafo diagnose the Plaintiff with any sort of communicable disease. At no time during this visit did he find the Plaintiff to be an unqualified food handler.  (Exhibits 2, 36 and 37.)
39. On September 24, 2006, Plaintiff underwent the regularly-scheduled blood draw in order to monitor his lipids and cholesterol. (Exhibits 2 and 38.)
40. On October 3, 2006, Plaintiff underwent his annual TB screen.  It is noted after getting the results of this test the Plaintiff was found to be food handler approved. (Exhibits 2 and 39.)
41. On October 4, 2006, Dr. Osafo performed a chart review for the Plaintiff and noted the Plaintiff is suffering from hypertension, increased cholesterol, and morbid obesity.  As a result, he ordered the Plaintiff a low bunk permit for eight weeks. (Exhibits 2 and 40.)
42. On October 12, 2006, Plaintiff underwent a PSA draw. (Exhibits 2 and 40.)
43. On October 14, 2006, Plaintiff underwent a routine EKG as part of the maintenance of his hypertension disease. (Exhibits 2 and 40.)
44. On October 22, 2006, Plaintiff was transferred away from the Illinois River Correctional Center and subsequently out of Dr. Osafo's care. (Exhibits 2 and 41.)

44. In Dr. Osafo's opinion, Mr. Bell was treated appropriately by himself as well as by each and every other medical professional who treated him for his hypertension while he was at the Illinois River Correctional Center. (Exhibit 2.)
45. At no time during Plaintiff's stay at the Illinois River Correctional Center was he diagnosed with any sort of communicable disease. (Exhibit 2.)
46. The entire time the Plaintiff was housed at the Illinois River Correctional Center, he was found to be food handler qualified by his medical treatment team. (Exhibit 2.)
47. All blood drawn from the Plaintiff was used to test and monitor Plaintiff's hypertension disease. At no time, was Plaintiff's blood draws used to monitor any sort of communicable disease that was not being disclosed to the Plaintiff. (Exhibit 2.)
48. Dr. Osafo does not choose which inmates work in the dietary at the Illinois River Correctional Center. (Exhibit 1, p. 34.)

Discussion and Conclusion

The court finds Defendant was not deliberately indifferent to any medical need of Plaintiff, much less a serious medical need because Plaintiff has no evidence that he indeed suffered any illness that he claims is a "mystery" illness and for which he was not treated. In order to state a cognizable claim against a prison official, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle*, 429 U.S. at 104. Deliberate indifference requires the prison official to act with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) *quoting Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Therefore, a prison official cannot be liable under the Eighth Amendment "unless he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. Further, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* At 837.

Plaintiff must prove deliberate indifference to a serious medical need. At a minimum, this requires actual knowledge of impending harm which is easily preventable so that a conscious, capable refusal to prevent harm can be inferred from the Defendant's failure to prevent it. *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997); *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To establish deliberate indifference, Plaintiff must show the Defendant ignored a known risk. *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). Additionally, in order to establish deliberate indifference, Plaintiff must show that the physician or other defendant must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw the inference. *Higgins v. Correctional Medical Services*, 178 F.3d 508, 511 (7th Cir. 1999); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995).

The exercise by a physician of his professional judgment does not constitute deliberate indifference. *Youngberg v. Romeo*, 457 U.S. 307, 322-323 (1982). Medical decisions, such as

whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. Additionally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Further, inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need. *Sellers v. Henman*, 41 F.3d 1100, 1102-03 (7th Cir. 1994). While a prisoner has the right to medical care, he does not have the right to determine the type and scope of the medical care he personally desires. A difference of opinion between a physician and the patient does not give rise to a constitutional right, nor does it state a cause of action under § 1983. *Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. Col. 1968). *See also, Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006). Inattention to a medical condition amounts to a constitutional violation only where the medical condition is serious. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991). Deliberate indifference also requires that Defendant either intended to harm Plaintiff or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to provide medical care. *See Smith-Bey v. Hospital Administrator*, 841 F.2d 751, 759 (7th Cir. 1988).

Plaintiff's is asserting that his rights under the Eighth Amendment has been violated. The Eighth Amendment does not require that prisoners receive "unqualified access to healthcare." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *see also, Hernandez v. Keane*, 341 F.3d 137 (2d Cir. 2003). Rather, inmates are entitled only to "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). Thus case law concludes that the Eighth Amendment does not entitle an inmate to demand specific care.

Plaintiff has presented no evidence to prove his claim of deliberate indifference to a serious medical need. Plaintiff alleges that Dr. Osafo was deliberately indifferent to his serious medical in that he did not inform him that he was suffering from an unknown illness. However, Plaintiff admits he has no evidence that he is suffering an unknown illness. Further, Plaintiff admits that no doctor has ever diagnosed with an illness. Plaintiff admits in his deposition that his entire case against Dr. Osafo is based on his own speculation. Plaintiff was denied a job in the baker because IDOC officials informed him that he was not a qualified food handler. The IDOC officials were mistaken. (See court's order granting summary judgment to state defendants.) It is undisputed that the entire time the Plaintiff was incarcerated at the IRCC he was deemed by medical staff that he was a qualified food handler. Based on the IDOC officials telling the plaintiff he was not a qualified food handler, the Plaintiff concluded, really the truth is he speculated that he was suffering from an unknown disease. Plaintiff reached his conclusion based on the institutional veto sheet (see Id.) and Dr. Osafo's thorough medical examinations during his regularly scheduled treatment for Plaintiff's hypertension, high cholesterol, and obesity. However, Dr. Osafo has testified that the treatment provided to the Plaintiff was only for the diseases of which the Plaintiff is aware, i.e. hypertension, high cholesterol and obesity. Further, Plaintiff admits that he has not suffered any physical injury as a result of any action or inaction of Dr. Osafo. Therefore, Dr. Osafo is entitled to summary judgment on Plaintiff's claim of deliberate indifference to his serious medical needs.

The court now turns to Plaintiff's claim of discrimination. Plaintiff alleges generally, that Defendants discriminated against him in the hiring of inmates at the bakery. However, Plaintiff admits that Dr. Osafo does not choose who works in dietary. Plaintiff attempts to involve Dr. Osafo in the discrimination claim for the same reasons he brought the deliberate indifference claim. Dr. Osafo had no personal involvement in the hiring of inmates in the IRCC bakery, therefore, he is entitled to summary judgment on Plaintiff's claim of discrimination. Further, Plaintiff's attempt to involve Dr. Osafo in the discrimination claim based on deliberate indifference to his serious medical fails for the same reason as his deliberate indifference claim fails. Specifically, Plaintiff has no evidence to support his allegation that he is or was suffering some unknown communicable disease.

As there are no genuine issues of material fact regarding the care and treatment provided to the Plaintiff, Ricky Bell, or as to Bell's claims of discrimination, Defendant, Seth Osafo, is granted to summary judgment.

Finally, Plaintiff has absolutely no evidence that he is the victim of a conspiracy between Dr. Osafo and the IDOC to keep him unaware that he is suffering from a communicable disease. Plaintiff has presented no evidence of a conspiracy to cover up his health status. In his deposition, Plaintiff alleges Defendants were involved in a conspiracy to cover up his health care situation that they discovered. However, he has presented no evidence of any conspiracy and he admits that he has no evidence that Defendants were involved in a conspiracy. Furthermore, Plaintiff admits he did not specifically address the conspiracy claim in his complaint. As he did not raise a claim of conspiracy in the complaint before this court and he has not has not been granted permission by this court to add a conspiracy claim to his lawsuit, it will not be considered.

This was the time for plaintiff to present his evidence, and he has presented none, other than a self-serving affidavit, which the Seventh Circuit has said is not adequate. The court finds Plaintiff's claims were based on nothing but his own speculation. *See* Plaintiff's Deposition. **Further,** the court finds this lawsuit is frivolous. Therefore, defendants are entitled to summary judgment in this case.

It is therefore ordered:

1. Defendants' motion for summary judgment [73] is granted. The clerk of the court is directed to enter judgment in favor of Defendant, Dr. Seth Osafo and against Plaintiff pursuant to Fed. R. Civ. P. 56.

2. If the plaintiff wishes to appeal this order, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).

3.The court finds this lawsuit is frivolous.

4. The clerk of the court is directed to terminate Chief Judge John Doe, forthwith.

Enter this 18th day of August, 2010.

**\s\Harold A. Baker**
_____
Harold A. Baker
United States District Judge